## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                        :
UNITED STATES OF AMERICA          :     CRIMINAL ACTION
                                        :
        v.                              :     No. 2:06-cr-0164
                                        :
BRIAN LEE MORGAN,                  :
        Defendant.                      :
_____:

**Memorandum**

YOHN, J.                                                    April 26, 2010

Pursuant to 28 U.S.C. § 2255, Brian Lee Morgan moves *pro se* to vacate the twenty-four

month portion of the seventy-five month sentence he received, after a guilty plea, for crimes

related to his involvement in an identity fraud scheme.  The court imposed this twenty-four

month portion of his sentence under 18 U.S.C. § 1028A(a)(1) for aggravated identity theft.

Section 1028A(a)(1) makes it unlawful, during the commission of certain felonies, to "knowingly

transfer[], possess[], or use[], without lawful authority, a means of identification of another

person . . . ."  Morgan now claims that his conviction and sentence violated due process because

the government did not establish and he did not admit that he knew at the time of the offense that

the means of identification he misused belonged to a real person, as required by the Supreme

Court's ruling in United States v. Flores-Figueroa, 129 S. Ct. 1886 (2009), decided after his

guilty plea and sentence.  Morgan did admit, as part of his guilty plea, that the means of

identification he misused was authentic.  He claims, however, that he would not have pleaded

guilty to the charge if he had correctly understood this element.  Based on the record in this case,

I find that the government did not establish that Morgan knew that the means of identification

belonged to a real person *at the time* he misused it.

The parties have not, however, sufficiently briefed the issue of what the effect of such a finding would be, including but not limited to: (1) whether a trial should be held on the aggravated identity theft charge; (2) whether Morgan should be resentenced on the other charges to which he pleaded guilty; or (3) whether Morgan should be allowed to withdraw his guilty plea to all of the charges. Accordingly, I will order the parties to submit supplemental briefing within 20 days.

## I.    Factual and Procedural Background

On April 4, 2006, the government filed an eight-count indictment against Morgan for his involvement in an identity fraud scheme. The government revised the charges on July 12, 2006, by filing a ten count superseding information. The superseding information added, among other things, a count for aggravated identity theft under § 1028A(a)(1), Count Nine. (Superseding Information 10.) Count Nine charged that on or about February 7, 2006, Morgan "knowingly and without lawful authority possessed and used a means of identification of another person, that is, a Pennsylvania driver's license in the name of A.S., during and in relation to credit card fraud." (Id.)

On July 13, 2006, the government submitted to the court a written Guilty Plea Agreement in which Morgan pleaded guilty to five counts of the superseding information, including Count Nine. At that time, the government also submitted a Change of Plea Memorandum, in which it acknowledged that at trial it would have had to prove the following elements to establish a violation of § 1028A(a)(1):

To establish a violation of § 1028A(a)(1) (Count Nine), the government must prove the following essential elements beyond a reasonable doubt:

1.    The defendant possessed a means of identification of **another person**;

2. The defendant **did so knowingly** and without lawful authority; and

3. The defendant's possession of the means of identification was during and in relation to a felony conviction.

(Change of Plea Mem. 3 (emphasis added).)

The government stated in the Memorandum that at trial it would have introduced evidence of Morgan's participation in an identity fraud scheme, including the following evidence:

1. A confidential witness would have testified that in approximately 2004 he "brought stolen information" to Morgan from which "Morgan made fraudulent driver's licenses, medical insurance cards and credit cards" which the witness and his associate told Morgan they would use, and which they did use, to obtain loans for the purchase of three cars (id. at 5);

2. A search of a building at 1913 S. Alden Street that Morgan visited on numerous occasions uncovered sophisticated equipment needed for the manufacture of false identification documents, as well as financial and identity information belonging to other people, such as "a checkbook in another person's name," "an authentic credit card in another person's name," and "an authentic New York driver's license in another person's name" (id. at 7-8);

3. A search of an unlocked briefcase found at 1913 S. Alden Street uncovered, among other things, "copies of various Pennsylvania driver's licenses" and "copies of personal checks in other people's names" (id. at 8);

4. A search of Morgan's residence at 4517 St. Malachy's Way uncovered, among other things, "checks and check[] books in other people's names" and "[a] credit application in another person's name" (id. at 10);

5. A search of Morgan's Plymouth uncovered, among other things, "a driver's registration in another person's name" (id. at 11);

6. A search of Morgan's Cadillac uncovered, among other things, "[a] Social Security card of another person," "authentic driver's licenses in various names," "credit reports and passport photos of various people," and "a Fed-Express envelope containing a cash register receipt roll with approximately 250 credit card account numbers" (id. at 10-11).

In all, the government determined that in these searches it had seized over 6,700 credit card account numbers.  (Id. at 9.)

Specific to Count Nine, the charge of aggravated identity theft under § 1028A(a)(1), the government stated that its agents found in the trunk of Morgan's Cadillac "an authentic Pennsylvania driver's license in the name of 'A.S.'" which "matched the name on a counterfeit American Express credit card found and seized at 1913 S. Alden Street" and which matched the name on "three counterfeit credit cards" created using "the credit card making machine" found at 1913 S. Alden Street.  (Id. at 11.)  The government further stated that it would have presented as a witness at trial a representative of the Pennsylvania Bureau of Motor Vehicles who would have testified that the Bureau "had issued the driver's license to 'A.S.'"  (Id.)

On July 19, 2006, Morgan pleaded guilty in open court to:  (1) producing and trafficking in counterfeit access devices (Count One); (2) producing false identification documents (Count Two); (3) possessing equipment used to make false identification documents (Count Five); (4) aggravated identity theft (Count Nine); and (5) possessing a firearm by a convicted felon in connection with another felony offense (Count Ten).  (Guilty-Plea Hr'g Tr. 15:8-16:18.)  As part of the guilty-plea hearing, the prosecutor summarized the essential elements of each charge, including the elements of aggravated identity theft under § 1028A(a)(1):

> To prove that violation, the Government would have to prove the Defendant; one, possessed **a means of identification of another person**; two, **did so knowingly** and without lawful authority; and, three, the Defendant's possession of the means of identification was during and in violation to a felony violation.

(Id. at 29:15-31:16 (emphasis added).)[1]

---

[1]  The court confirmed that Morgan knew and understood the elements of the charges he faced.  (Id. at 31:17-19.)  The court also confirmed that Morgan reads, writes, and understands the English language and completed the 12th grade.  (Id. at 3:14-18.)

The court then asked the prosecutor to set forth the facts the government would have been prepared to prove at trial, to ensure that Morgan would "admit that those facts are correct and that [he] did the things they say [he did]" and that "these facts fit the charges against [him]." (Id. at 31:20-25.) The prosecutor began by adopting the facts set forth in the Change of Plea Memorandum. (Id. at 32:3-14.) Morgan confirmed that he had read those facts and agreed and admitted that he "did the things that the Government says [he] did in that document." (Id. at 32:15-17.)[2] The prosecutor then summarized those facts in open court. (Id. at 32:21-38:11.) In general, the prosecutor stated that the search of 1913 Alden Street revealed that the property "was a plant for making counterfeit credit cards and counterfeit IDs":

> There was . . . computer equipment found, along with counterfeit documents, counterfeit credit cards, counterfeit driver's license, [and] authentic documents of stolen identification and credit card information from different individuals.

(Id. at 34:21-25.) The prosecutor also stated specifically that "the basis for the 1028A violation" was the discovery in the trunk of Morgan's Cadillac of "an authentic driver's license" issued by the Pennsylvania Bureau of Motor Vehicles to an individual whose initials are A.S. and whose name "matched the name on a counterfeit American Express card found and seized at 1913 South Alden Street" and three other credit cards made on a "credit-card-making machine" found at the Alden Street residence (id. at 35:21-36:7). The prosecutor reiterated that the government would have presented as a witness a representative of the Pennsylvania Bureau of Motor Vehicles, who would have testified that "it issued the driver's license to this individual with the initials A.S." (Id. at 35:24-36:1.) Morgan then agreed that the prosecutor had "accurately

---

[2] Morgan also agreed that to establish the factual basis for his guilty plea the government could use the information he provided "under his off-the-record proffer letter" dated February 28, 2006. (Id. at 28:2-10.) The government has not, however, revealed or relied upon the contents of this letter in opposition to the instant motion.

summarized [his] activities" and again admitted "doing what the Government says that [he] did." (Id. at 38:12-17.)[3]

The court then found, based on its colloquy with Morgan and the prosecutor, that: (1) Morgan was competent to plead guilty; (2) his plea was free and voluntary and not the result of any force or threats or any promises apart from those contained in the written Guilty Plea Agreement; (3) there was a factual basis for the plea of guilty; and (4) he understood the charges, his legal rights, and the maximum possible penalties, including that he was waiving his right to a trial by pleading guilty. (Id. at 38:24-39:21.)[4]

---

[3] The prosecutor also summarized the Guilty Plea Agreement in open court (id. at 23:1-27:15, 28:2-7), after which the court confirmed that: (1) Morgan agreed to the accuracy of the summary; (2) he understood that the written Guilty Plea Agreement, not the summary, constituted the actual plea agreement; (3) he had time to discuss the Guilty Plea Agreement with his attorney and to decide to plead guilty under the agreement; and (5) he had read, understood, signed, and agreed to the Guilty Plea Agreement (id. at 27:16-19, 28:11-29:6).

[4] Morgan also agreed to waive his right under § 2255 to raise a collateral attack to his conviction. (Id. at 22:8-20.) He now argues, however, that he should be allowed to bring the instant § 2255 motion because when he agreed to this collateral-attack waiver he did not understand the elements of § 1028A(a)(1). (Defendant's Motion to Have His Motion to Recall Mandate Recharacterize[d] as a 2255 Motion ("Mot. to Recharacterize") 1.)

The government has not responded to this argument. In a similar context, the Third Circuit has held that the government waives enforceability of an appellate waiver if the government chooses not to raise it, because plea agreements are contractual in nature:

> In other words, the mere fact that a plea agreement contains a waiver of a defendant's right to file a direct appeal does not mean that the enforceability of that waiver is automatically at issue in that appeal. This is so because the government may always choose not to invoke an appellate waiver.

United States v. Goodson, 544 F.3d 529, 535 (3d Cir. 2008); see also id. at 535 n.4 (listing reasons why government might choose not to invoke waiver, including that government might recognize that "the best way to address the defendant's challenge is on the merits of the issue raised" or that "the waiver might not be enforceable"); United States v. Bey, 345 F. App'x 759, 760 n.1 (3d Cir. 2009) (appellate waiver did not bar review of any issues raised, because government did not invoke it); and see United States v. Williams, 510 F.3d 416, 422 (3d Cir. 2007 ("'Plea agreements, although arising in the criminal context, are analyzed under contract

On June 17, 2008, after granting the government's motion for a downward departure pursuant to U.S.S.G. § 5K1.1 based on Morgan's cooperation with prosecutors concerning the other participants in the identity fraud scheme, the court sentenced Morgan to seventy-five months' imprisonment, consisting of: (1) fifty-one months to be served concurrently on Counts One, Two, Five, and Ten; and (2) twenty-four months on Count Nine, to be served consecutively to the sentence on Counts One, Two, Five, and Ten. (Judgment, Docket No. 39.)

On June 12, 2009, Morgan filed a "Motion to Recall the Mandate." (Docket No. 40.) In that motion, Morgan claimed that his conviction under Count Nine was "demonstrably wrong" because the government could not have proved that he knew that the means of identification he was accused of misusing in Count Nine belonged to a real person, as is required by the Court's later ruling in Flores-Figueroa. (Mot. to Recall Mandate 2.) According to Morgan, "[t]he government's failure to provide proof of this element requires reversal of the defendant's conviction":

> An element of the statute 18 U.S.C. 1028A(a)(1) which requires a finding that the defendant was aware that the bogus identifying information used belonged to a real person requires proof. The government must prove this particular element. The government's failure to provide proof of this element requires reversal of the defendant's conviction even though the evidence may have strongly suggested that the defendant should have known that the bogus identifying information belonged to an actual person . . . .

(Id. (citing United States v. Tureseo, 566 F.3d 77, 82-83 (2d Cir. 2009)).) Because Morgan's motion was styled as a "Motion to Recall the Mandate," but challenged his conviction and sentence, on July 20, 2009, the court offered Morgan the choice of pursuing the motion as filed

---

law standards[.]'") (quoting United States v. Nolan-Cooper, 155 F.3d 221, 236 (3d Cir. 1998). Similarly, in the instant matter, by failing to invoke Morgan's collateral-attack waiver, the government has waived any argument that the collateral-attack waiver bars the instant motion.

or having it recharacterized as a § 2255 motion, pursuant to United States v. Miller, 197 F.3d 644 (3d Cir. 1999). (Docket No. 42.)[5]

On July 31, 2009, when he filed his Motion to Recharacterize, Morgan attempted to clarify his claim, stating that his guilty plea "violated the due process clause of the United States Constitution." (Mot. to Recharacterize at 2.) Morgan also claimed that he "unquestionably received constitutionally deficient advice from counsel and as a matter of law could not have voluntarily, knowingly or intelligently pled guilty to a statute [as to] which he lacked understanding of the elements." (Id.) He stated that he "never met" A.S., that the real A.S. "never gave me an ID," that he never agreed as part of his guilty plea that he "knew" A.S., that he never "agreed and admitted to this 'A.S.' authentic PA driver's license," and that he never agreed that he "knew" of the authenticity of the license. (October 11, 2009, Letter from Morgan to Court replying to government's response to Motion to Recharacterize ("Reply") 1-2.)

---

[5] Black's Law Dictionary defines a "mandate" as "[a]n order from an appellate court directing a lower court to take a specified action." Black's Law Dictionary 1047 (9th ed. 2009). According to the Third Circuit, "[t]he mandate of an appellate court establishes the law binding further action in the litigation by another body subject to its authority." In re Chambers Development Co., Inc., 148 F.3d 214, 224 n.8 (3d Cir. 1998) (citing Finberg v. Sullivan, 658 F.2d 93, 97 n.5 (3d Cir. 1980)). "Functionally, the mandate is 'the formal vehicle for conveying the terms of our disposition to the District Court.'" Chambers, 148 F.3d at 224 n.8 (quoting Clarke v. United States, 915 F.2d 699, 716 (D.C. Cir. 1990)).

Thus, a "motion to recall the mandate" does not seem to be an appropriate vehicle for Morgan's claims: no appellate court has issued any mandate and it is doubtful that this court would have the power to "recall" one regardless. Accordingly, the court allowed Morgan the opportunity to recharacterize his motion to file it under § 2255, "the statutory means by which federal prisoners attack their sentences on collateral review." Miller, 197 F.3d at 646; see also Mason v. Meyers, 208 F.3d 414, 418 (3d Cir. 2000) (based on Miller, district court must "provide certain prophylactic 'notice' measures before either re-characterizing a post conviction motion as a § 2255 motion or ruling on a § 2255 motion denominated as such when the petitioner is proceeding pro se.").

## II.  Legal Standards

Pursuant to 28 U.S.C. § 2255, a federal prisoner may move the sentencing court to vacate, set aside, or correct his sentence if "the sentence was imposed in violation of the Constitution or laws of the United States, . . . the court was without jurisdiction to impose [the] sentence, . . . the sentence was in excess of the maximum authorized by law, or [the sentence] is otherwise subject to collateral attack."  When a prisoner files a § 2255 motion, the district court may dismiss the motion without an evidentiary hearing if "the motion and files and records of the case show conclusively that the movant is not entitled to relief."  Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir. 1989) (citation omitted).  In making this determination, "the court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record."  Id.  A court may ascertain the factual basis for a guilty plea "by looking to the defendant's own admissions, the government's proffer of evidence, the presentence report, or whatever means is appropriate in a specific case – so long as the factual basis is put on the record."  United States v. Cefaratti, 221 F.3d 502, 509 (3d Cir. 2000) (internal quotations omitted).

In Bousley v. United States, 523 U.S. 614, 618 (1998), the Supreme Court held that if a guilty plea concerns counts arising under a statute that is later found not to reach the defendant's conduct, that guilty plea violates due process.  "A plea of guilty is constitutionally valid only to the extent it is 'voluntary' and 'intelligent.'"  Id. (citation omitted).  Where a record "reveals that neither [the petitioner], nor his counsel, nor the court correctly understood the essential elements of the crime with which he was charged[, the] petitioner's plea [is] constitutionally invalid."  Id. at 618-19.

If a plea is found to be constitutionally invalid, a court may have a number of different

remedies under § 2255:

> If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C. § 2255; see also United States v. Barron, 172 F.3d 1153, 1158 (9th Cir. 1999) ("[There

is no] reason for reducing § 2255 remedies to two (discharge or new trial) when a plea agreement

is in force . . . . [T]he district court can distinguish the convictions that are still valid, reinstate the

judgment, and resentence.").

Thus, "if convictions on some counts of a multi-count indictment are vacated the court

may resentence the defendant to enhanced sentences on the remaining counts." United States v.

Goggins, 99 F.3d 116, 118 (3d Cir. 1996). "[I]t is within the bounds of due process to resentence

a defendant on remaining counts after some, but not all counts, are vacated." McKeever v.

Warden SCI-Graterford, 486 F.3d 81, 88 (3d Cir. 2007) (contrary to the defendant's contention,

"rescission of the entire plea agreement was not the only appropriate remedy"). Furthermore,

although a court may vacate the entire plea agreement, the Third Circuit has declined to adopt a

rule that would "render a multi-count indictment *per se* invalid when a subsequent change in the

law renders a defendant innocent of some, but not all, of the counts therein" and has rejected the

argument "that such a plea could never be entered by a defendant voluntarily and intelligently."

Id. at 86 (emphasizing that the "sentencing package doctrine," whereby an entire plea agreement

may be vacated where a part is held invalid, should be confined to cases in which the sentences

on the underlying counts were interdependent); see also Brady v. United States, 397 U.S. 742,

756-57 (entire plea need not be vacated due to subsequent change in the statute upon which only a part of the plea was premised); United States v. Murray, 144 F.3d 270, 273 n.4 (3d Cir. 1998) (interdependent offenses "result in an aggregate sentence, not sentences which may be treated discretely.")

## III. Discussion

Morgan claims that his conviction under Count Nine violated due process because § 1028A(a)(1) required the government to prove that he knew at the time that the means of identification he misused belonged to a real person. (Mot. to Recharacterize 1.) He claims that the government could not have proved this element because he never met A.S., the owner of the driver's license in question, and did not know that the driver's license belonged to a real person. (Reply 1-2.)[6]

The government argues that, consistent with the decision in Flores-Figueroa, it acknowledged during the proceedings its obligation to prove that Morgan knew that the means of identification he was misusing belonged to a real person and it set forth a sufficient factual basis to establish this element. (Government's Response to Defendant's Motion Pursuant to 28 U.S.C. § 2255 ("Response") 4, 5, 7.) Furthermore, the government argues that Morgan expressly agreed and admitted to the factual basis for his guilty plea. (Id.)

---

[6] Morgan also claims that his counsel was ineffective by failing to explain to him the proper elements of § 1028A(a)(1). (Mot. to Recharacterize at 1.) Given, however, that the Supreme Court issued its decision in Flores-Figueroa only subsequent to Morgan's sentencing, Morgan cannot overcome the strong presumption that his counsel's performance met "an objective standard of reasonableness under prevailing professional norms," even assuming for the purposes of this motion that Morgan's allegation concerning his counsel's performance is true. Buehl v. Vaughn, 166 F.3d 163, 169 (3d Cir. 1999) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984) (to establish a viable ineffective assistance of counsel claim, a defendant must show that: (1) his attorney's performance was deficient; and (2) the deficient performance prejudiced his defense). Like Morgan, the prosecutor, and the court itself, Morgan's counsel did not have the benefit of Flores-Figueroa at the time of sentencing.

I find that the government failed to proffer sufficient evidence to support the conviction and sentence under § 1028A(a)(1). Although the elements of § 1028A(a)(1) as set forth by the government were not inconsistent with <u>Flores-Figueroa</u>, there is no evidence in the record that Morgan actually knew that A.S. was a real person at the time that Morgan misused A.S.'s driver's license.

The parties have not, however, provided the court with sufficient briefing concerning what the effect of such a finding might be. A court has a number of remedies under § 2255 when it finds a judgment to have violated due process. For example, the court may vacate and set the judgment aside, resentence the defendant, grant a new trial, or correct the sentence "as may appear appropriate." 28 U.S.C. § 2255. In addition, "if convictions on some counts of a multi-count indictment are vacated the court may resentence the defendant to enhanced sentences on the remaining counts." <u>Goggins</u>, 99 F.3d at 118. I will therefore order the parties to provide supplemental briefing on this issue within 20 days.[7]

---

[7] Furthermore, the parties have not sought an evidentiary hearing pursuant to § 2255. Under § 2255, a district court must hold an evidentiary hearing unless the "motion and the files and records of the case conclusively show" that the petitioner is not entitled to relief. 28 U.S.C. § 2255; <u>see also</u> <u>United States v. Booth</u>, 432 F.3d 542, 545-46 (3d Cir. 2005); <u>United States v. McCoy</u>, 410 F.3d 124, 131 (3d Cir. 2005). It is not clear, however, whether such a hearing would serve any useful purpose at this time. Not only is there no basis in the record to support the government's position, but also the government has not sought to provide any additional admissible evidence outside of the record to support its position. <u>See</u> <u>Bousley</u>, 523 U.S. at 624 (where court allowed petitioner to try to establish that he was "actually innocent," government was not limited on remand to existing record but was permitted "to present any admissible evidence" even if that evidence had not been presented during plea colloquy and would not normally have been offered prior to court's decision interpreting statute).

**A.** **The Supreme Court's Ruling in <u>Flores-Figueroa</u> Requires the Government to Have Shown That at the Time Morgan Misused A.S.'s Driver's License Morgan Knew That A.S. Was a Real Person**

Section 1028A(a)(1) imposes a mandatory 2-year prison term for anyone who, during the commission of certain felonies,"knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person . . . ."  Prior to the ruling in <u>Flores-Figueroa</u>, circuits were split over whether the word "knowingly" in § 1028A(a)(1) only applies to the phrase "transfers, possesses, or uses a means of identification" or also applies to the phrase "of another person."  <u>Compare</u> <u>United States v. Godin</u>, 534 F.3d 51, 61 (1st Cir. 2008) (knowledge requirement applies to "of another person") with <u>United States v. Mendoza-Gonzalez</u>, 520 F.3d 912, 915 (8th Cir. 2008) (finding that "knowingly" only modifies "transfers, possesses, or uses" and therefore the government must only prove "that the means of identification in fact belonged to a real person, not that the defendant knew that it did.").  At the time Morgan pleaded guilty, neither the Third Circuit nor the Supreme Court had interpreted this element of § 1028A(a)(1).

The Supreme Court did interpret this element of § 1028A(a)(1), however, subsequent to Morgan's guilty plea.  In <u>Flores-Figueroa</u>, the defendant had worked under a false name, using a social security number and alien registration number that did not belong to a real person.  <u>Flores-Figueroa</u>, 129 S.Ct. at 1889.  After six years of using such counterfeit identity information, he presented his employer with a new counterfeit alien registration card and social security card, which used his real name but with alien registration and social security numbers that were assigned to actual people.  <u>Id.</u>  After the government charged him with, among other things, aggravated identity theft under § 1028A(a)(1), he moved for acquittal, claiming that the government "could not prove that he *knew* that the numbers on the counterfeit documents were numbers assigned to other people."  <u>Id.</u> (emphasis in original).  The government replied – and the

district court agreed – that the government need not prove such knowledge.  Id.  After a bench

trial, the district court found the defendant guilty of aggravated identity theft, a determination

upheld by the court of appeals.  Id.  The Supreme Court granted certiorari to consider the

"knowledge" issue.  Id.

In their arguments before the Court, the parties agreed that the provision of § 1028A(a)(1)

that requires the government to prove that a defendant "knowingly transfer[red], possesse[d], or

use[d], without lawful authority, a means of identification of another person" applies "only where

the offender knows that he is transferring, possessing, or using *something*."  Id. (emphasis in

original).  The parties did not agree, however, "whether the provision requires that a defendant

also know that the *something* he has unlawfully transferred is, for example, a real ID belonging to

another person rather than, say, a fake ID . . . ."  Id. (emphasis in original).

The Court held that § 1028A(a)(1) required that the defendant knew that he was

unlawfully transferring, possessing, or using real means of identification.  Id. at 1894.  The Court

explained that "[a]s a matter of ordinary English grammar, it seems natural to read the statute's

word 'knowingly' as applying to all the subsequently listed elements of the crime."  Id. at 1890.

"In ordinary English, where a transitive verb has an object, listeners in most contexts assume that

an adverb (such as knowingly) that modifies the transitive verb tells the listener how the subject

performed the entire action, including the object as set forth in the sentence."  Id.  Furthermore,

"fully consistent with this ordinary English usage . . . . courts ordinarily read a phrase in a

criminal statute that introduces the elements of a crime with the word 'knowingly' as applying

that word to each element."  Id. at 1891 (citations omitted).  Accordingly, the Court held that,

pursuant to "the ordinary meaning, in English or through ordinary interpretive practice," the word

"knowingly" in § 1028A(a)(1) modifies not only the phrase "transfers, possesses, or uses" but

also the phrase "of another person." Id. at 1894. The Court concluded therefore that "§ 1028A(a)(1) requires the Government to show that the defendant knew that the means of identification at issue belonged to another person." Id.[8]

Throughout its opinion, the Court distinguished between identity information that "belongs to another person," i.e., "a real person," – the unlawful use of which constitutes "identity theft" as in § 1028A(a)(1) – and identity information that is "false" or "counterfeit" – the unlawful use of which constitutes "identity fraud," which is covered by a separate provision. Id. at 1892-93. The Court focused on the question of how the government might prove that a defendant knew that the misused means of identification was real. Id. at 1893. The court noted that the knowledge requirement would generally be easy to prove in the "classic case" of identity theft, "where a defendant has used another person's identification information to get access to that person's bank account" or "when the defendant has gone through someone else's trash to find discarded credit card and bank statements, or pretends to be from the victim's bank and requests personal identifying information." Id.

The Court hypothesized a contrasting scenario, however, where a defendant "knew the papers were not his" but, perhaps, "did not care whether the papers (1) were real papers

---

[8] Morgan appears to believe that § 1028A(a)(1) was ambiguous until the Supreme Court issued its ruling in Flores-Figueroa. (Reply 2.) He states that two of the Justices of the Court, Justices Breyer and Ginsburg, suggested as much. (Id.) Morgan is incorrect. To begin, neither Justice concluded that § 1028A(a)(1) was ambiguous. In fact, Justice Breyer, in his opinion in Flores-Figueroa, concluded the opposite: that "the ordinary meaning" of § 1028A(a)(1) "requires the Government to show that the defendant knew that the means of identification at issue belonged to another person." 129 S.Ct. at 1894. Meanwhile, Justice Ginsburg did not make any separate statements at all about whether the statute was ambiguous. She merely joined in Justice Breyer's opinion. Id. at 1888. Furthermore, when the Supreme Court interprets a statutory provision for the first time, the Court is not curing an unconstitutionally ambiguous statute. Rather, the Court is explaining what the statute meant "ever since the statute was enacted." See Bousley, 523 U.S. at 625 (Stevens, J., concurring).

belonging to another person or (2) were simply counterfeit papers." Id. at 1893.  In other words, the Court envisioned three possible factual scenarios under § 1028A(a)(1), only the first of which would result in liability:  (1) where a defendant knowingly misused "a real ID belonging to another person"; (2) where a defendant knowingly misused "a fake ID"; and (3) where a defendant did not know one way or another whether the means of identification he or she misused was "real" or merely "counterfeit" because the defendant did not care.  Id. at 1889, 1893.

**B.    Following Flores-Figueroa, Courts Have Vacated Convictions Under § 1028A(a)(1) Where There Was No Direct Evidence That The Defendant Knew That Misused Means of Identification Belonged to a Real Person and Where No Inference of Such Knowledge Could be Drawn From the Record**

Following Flores-Figueroa, numerous rulings in courts across the country have hinged upon the adequacy of the government's proof of whether, at the time that a defendant misused a means of identification, he or she knew it was real or counterfeit.[9]  In particular, because the mental state of "knowledge" may be inferred from circumstantial evidence (see, e.g., United

_____

[9]  Although cases from other jurisdiction are not binding on this court, they are instructive, and are particularly useful here because the Third Circuit has yet to address in detail the standards for sufficiency of evidence under § 1028A(a)(1).  The Third Circuit has only addressed this issue in three cases subsequent to Flores-Figueroa, and merely in a cursory fashion.  In United States v. Buckeridge, 326 F. App'x 72 (3d Cir. 2009), the government "rightly conceded" that, based on Flores-Figueroa, the defendant's conviction for aggravated identity theft "must be vacated" because the government had "made no effort" to prove that the defendant knew that the means of identification he misused belonged to another person.  In United States v. Reed, 350 F. App'x 675, 678 (3d Cir. 2009), the court did not actually reference Flores-Figueroa.  The court concluded that there was a sufficient factual basis to establish the elements of aiding and abetting aggravated identity theft under § 1028A(a)(1) but did not make clear what that factual basis was.  Id.  The limited portion of the record that the court referenced appears only to have involved the use of *false* identity information to commit bank fraud.  Id.  Finally, in United States v. Carrion-Brito, No. 08-1562, 2010 WL 299159, at *5 (3d Cir. Jan. 27, 2010), the court concluded that it was clear that a factual basis existed for the defendant's aggravated identity theft conviction, because the record showed that in order to obtain a passport the defendant purchased from an actual person that person's own identity information.

- 16 -

States v. Kallash, 785 F.2d 26, 28 n.2 (2d Cir. 1986) (affirming district court jury instruction that "[k]nowledge may be inferred from acts and . . . inferences that may arise from a combination of acts")), these rulings have often wrestled with the question of whether an inference of such knowledge could be drawn from circumstantial evidence, where no direct evidence of such knowledge exists.

For example, in United States v. Tureseo, 566 F.3d 77, 82-83 (2d Cir. 2009), the defendant had been convicted in a jury trial of aggravated identity theft under § 1028A(a)(1) because he had used another person's birth certificate to make a false claim of U.S. citizenship. The Second Circuit vacated this conviction because the trial court had refused to instruct the jury "that an aggravated identity theft conviction requires a finding that [the defendant] knew that the means of identity he used . . . belonged to another person, i.e., an actual person." Id. at 86. The court concluded that the trial court's error was not harmless because it was questionable whether the defendant, who had never met and could not identify the person to whom the birth certificate belonged, knew that the birth certificate was real. Id.[10]

Furthermore, in United States v. De La Rosa, 346 F. App'x 468, 471 (11th Cir. 2009), the Eleventh Circuit vacated the defendant's conviction under § 1028A(a)(1). Although the

_____

[10] Morgan claims that in Tureseo, "the Court considered that the defendant never met the victim, nor could the victim identify the defendant, suggesting that the defendant obviously did not know if the victim was a real person." (Reply 1.) He claims that under the reasoning of Tureseo the government in the instant case should have had to prove that Morgan actually met A.S., whose driver's license Morgan misused. (Id.) The court in Tureseo did not find, however, as Morgan claims, that the evidence suggested that the defendant "obviously" did not know if the victim was "a real person." Rather, the court remanded the case for further proceedings to determine whether the defendant had the requisite knowledge. Tureseo, 566 F.3d at 86. In fact, the court noted that "the evidence does not all flow in one direction," and that there appeared to be "substantial evidence for the jury to conclude that [the defendant] knew that [the victim] was an actual person at the time he used [the victim's] birth certificate to falsely claim United States citizenship . . . ." Id.

defendant had stipulated that he submitted a passport application that matched the name of a real person, the court found that the evidence at trial showed "at best" that the defendant "had what *purported* to be an authentic certified copy of a birth certificate" (id. at 470 (emphasis added)) but there was no evidence regarding how he obtained the copy "or whether he knew that it was real and not a forgery" (id. at 470-71). The court found that knowledge that the birth certificate was real could not be inferred because in the circumstances of the case it did not matter to the defendant whether the birth certificate was real or counterfeit. Id. at 471 n.2.

Similarly, in United States v. Gaspar, 344 F. App'x 541, 546-47 (11th Cir. 2009), the Eleventh Circuit found that the evidence at trial was insufficient to prove that the defendant knew that the birth certificate she used in applying for a passport belonged to a real person. The defendant had stipulated before her bench trial that the birth certificate was real and belonged to another person. Id. at 543. The district court found that because the defendant was attempting to obtain a passport, the trial court could infer from the facts in the stipulation that "she would obviously want to use the documentation of an actual person because a phony person, a nonexisting person, would create problems when the passport agency attempted to run background checks, *et cetera*." Id. The district court also found, alternatively, that such knowledge could be inferred because the defendant purchased the birth certificate for value and then obtained other documents in order to apply for a passport. Id.

The Eleventh Circuit concluded in Gaspar that the government had not met its burden of proof and vacated the defendant's sentence. Id. at 546. Although the defendant knew that the birth certificate was not hers and stipulated that it was real and that it belonged to a another person, the court concluded that there was no direct evidence that she knew the birth certificate belonged to a real person *at the time* she applied for a passport. Id. There was no evidence that

the defendant ever met or spoke with the actual person whose birth certificate the defendant misused or that the person who sold the defendant the birth certificate mentioned that the birth certificate referred to an actual person.  Id.  Furthermore, the defendant did not commit "classic" identity theft, in that she did not "search another person's trash, hack into someone's computer account, or pretend to be someone else to obtain personal information."  Id.  Instead, the defendant bought the birth certificate from a co-worker in circumstances where it would not have mattered to the defendant whether or not the birth certificate was that of a real person:

> [A]n individual can successfully use documents that do not belong to a real person in order to secure benefits such as employment, even though employers also presumably run background checks.  In any event, even if the district court's inference was valid, at most it proves that [the defendant] might have an incentive to buy an authentic birth certificate, not that she *knew* whether she actually purchased one.

Id. (emphasis in original).[11]

---

[11]  See also United States v. Ochoa-Gonzalez, 598 F.3d 1033, 1038 (8th Cir. 2010) (where defendant stated during guilty plea colloquy that she did not know, at time she committed offense, that passport belonged to real person, plea was not knowing or voluntary, in light of Flores-Figueroa, because neither she, nor her counsel, nor district court understood that such knowledge was essential element of aggravated identity theft); United Staves v. Ogbemudia, No. 08-20416, 2010 WL 444404, at *1 (5th Cir. Feb. 2, 2010) (where defendant pleaded guilty but, on appeal, government conceded that record did not establish he knew means of identification belonged to actual people, court vacated conviction and remanded for entry of new plea); United States v. Cain, No. 09-4038, 2009 WL 4756556, at *1 (4th Cir. Dec. 14, 2009) (after guilty plea, court vacated conviction and sentence where government conceded that no evidence existed in record showing defendant's knowledge that means of identification belonged to another person); United States v. Ordonez-Alquijay, 329 F. App'x 35, 36 (8th Cir. 2009) (court reversed conviction where government submitted no evidence that defendant knew alien registration number he misused belonged to actual person); United States v. Chavez-Qunitana, 330 F. App'x 724, 727 (10th Cir. 2009) (court reversed conviction where government made no attempt to show how defendant obtained social security number or whether he was acquainted with person whose social security number he was using).

**C.** **Other Courts, Following <u>Flores-Figueroa</u>, Have Affirmed Convictions Under § 1028A(a)(1), But Only Where There Was Direct Evidence That The Defendant Knew That Misused Means of Identification Belonged to a Real Person or Where An Inference of Such Knowledge Could be Drawn From the Record**

In contrast to the cases subsequent to <u>Flores-Figueroa</u> in which courts have vacated convictions under § 1028A(a)(1), there have also been numerous courts from other jurisdictions that have upheld such convictions where the record reflected that the defendant knew that the misused means of identification belonged to an actual person. In these cases, if there was not direct evidence of such knowledge, the sufficiency of such evidence has hinged on whether an inference of such knowledge could be drawn.

For example, in <u>United States v. Miranda-Lopez</u>, 336 F. App'x 674, 675 (9th Cir. 2009), the Ninth Circuit affirmed the defendant's conviction under § 1028A(a)(1). In that case, the defendant had stipulated that the identification card he misused to enter the United States was "genuine." <u>Id.</u> The card contained a photograph and fingerprint of another individual. <u>Id.</u> "[T]here was no evidence that the card looked doctored or fake, and a Customs and Border Protection Officer testified that the card looked genuine." <u>Id.</u> The court held that it could be reasonably inferred from this evidence that the defendant "knew the identification card he used to enter the United States belonged to a real person other than himself." <u>Id.</u> "In particular, the jury could have relied on the inference that there would have been little point in using a counterfeit identification not in [the defendant's] name." <u>Id.</u>

Similarly, in <u>United States v. Holmes</u>, 595 F.3d 1255, 1258 (11th Cir. 2010), the Eleventh Circuit found that an inference of knowledge that the means of identification of a real person was being misused could be drawn from the defendant's *repeated* use of the victim's name and social security number to obtain driver's licenses, identification cards, a passport, and a line of credit.

The government presented evidence at trial of the "rigorous verification process" to which the defendant subjected the victim's social security card, including witnesses who testified that government officials would have verified the authenticity of the card each time that the defendant used it to apply for identity information in the victim's name. Id. at 1257. The defendant argued that "the government did not explain how she obtained [the victim's] social security card or birth certificate and did not prove that she obtained the card or birth certificate in circumstances that suggest that she knew that [the victim] is a real person." Id. at 1258. The court concluded, however, that a reasonable jury could have found beyond a reasonable doubt that after the defendant used the card to obtain driver's licenses, identification cards, and a passport, the defendant's willingness to subject the card to repeated government scrutiny established that "she knew, all along, that the social security card belonged to a real person and was not a forgery." Id. Furthermore, the court concluded that "a reasonable jury could have found that [the defendant] would not have sought credit using [the victim's] personal information if [the defendant] were not confident that [the victim] likely had an actual credit history." Id.[12]

---

[12] See also United States v. Singh, No. 09-4382, 2010 WL 358723, at *2 (4th Cir. Feb. 2, 2010) (where defendant "provided the district court with a signed statement of facts in which he admitted that the birth certificate and driver's license he used to obtained a passport belonged to an actual person" and the record confirmed that the defendant "knew that the certificate and license belonged to another person" there was "a sufficient basis in fact" to support the defendant's guilty plea); United States v. Martinez Santana, No. 09-4302, 2010 WL 235263, at *1 (4th Cir. Jan. 20, 2010) (factual basis existed to support guilty plea for aggravated identity theft where government proffered evidence that the crux of the defendant's scheme was to steal and sell the identities of actual people, which was corroborated by circumstantial evidence that the means of identification were sold at a premium); United States v. Stephens, 571 F.3d 401, 406 (5th Cir. 2009) (conviction under § 1028A(a)(1) reasonable where evidence included email denoting only some of the listed social security numbers as "fake" and other documents were found in defendant's apartment tracking names and balances on PayPal accounts).

**D. Here, the Government Did Not Proffer Direct Evidence That Morgan Knew the Misused Driver's License Belonged to a Real Person and No Inference of Such Knowledge Can Be Drawn From the Circumstantial Evidence Submitted by the Government**

In the instant motion, Morgan questions how the government "hope[d] to establish" that he knew A.S.'s driver's license belonged to a "real person" when he "never agreed that [he] knew 'A.S.'," "never met Mr. or Mrs. 'A.S'" and "the real 'A.S.' never gave me an ID." (Reply 2.) Morgan further claims that he never "agreed and admitted to this 'A.S.' authentic PA driver's license," and never agreed that he "knew" of the authenticity of this license. (Id.)[13]

The government argues that it presented evidence sufficient to establish the "knowledge" element required in Flores-Figueroa. According to the government, such evidence included the seizure from Morgan's properties and vehicles of: (1) "stolen documents containing numerous individuals' identity and credit card information"; (2) "stolen documents" that "included rolls of cash register receipts, credit cards, credit applications, credit reports, checks, check books, Social Security cards, driver's licenses, driver registrations, and Philadelphia police reports"; and (3) "numerous counterfeit credit cards and driver's licenses found at and seized from the defendant's plant, home, and cars." (Response 5-6.) The government argues that such evidence established that Morgan was operating a "plant to make counterfeit credit cards and identification documents." (Id. at 6.) Specific to Count Nine, the government presented evidence of "an authentic Pennsylvania driver's license in the name of 'A.S.' found in the defendant's car, a counterfeit American Express credit card in the same name found at defendant's plant, and evidence of three other counterfeit credit cards in the same name being made at the plant." (Id. at

---

[13] Webster's dictionary provides several definitions for the word "authentic," including "not imaginary or specious: real, genuine." Webster's Third New Int'l Dictionary 146 (1981).

7.)  The government notes that Morgan agreed and admitted to these facts – which includes not just the general facts but also the facts specific to Count Nine.  (Id.)

According to the government "[t]he volume of stolen identity and financial documents, the equipment and the materials for making counterfeit documents, and the volume of counterfeit documents established that the defendant was in the business of stealing real people's identity and financial records and using their information to make the counterfeit documents."  (Id. at 8.)  The government also claims that the evidence presented "established that the stolen identity of 'A.S.' was of a real person, that the defendant knew it was, and that the defendant used that real identity to make counterfeit credit cards."  (Id.)

The problem with the government's argument is that the sheer volume of other apparently authentic means of identification does not establish that Morgan knew that the specific means of identification in question – A.S.'s driver's license – was real at the time he misused it.  The government has not established that Morgan's identity fraud scheme, whereby he operated a plant that manufactured counterfeit documents, required that Morgan always use authentic means of identification belonging to other people in order to create the counterfeit documents that were his end-product.  It may only have been necessary, for Morgan's purposes, that the means of identification upon which he based his counterfeit documents *looked* authentic.[14]

Furthermore, Morgan's agreement at the time of his guilty plea that A.S. driver's license was "authentic" is not the same thing as an admission that Morgan knew *at the time* that he was

---

[14]  Indeed, as an example of how an authentic looking driver's license could be used in conjunction with counterfeit credit cards as part of an identity fraud scheme, the government showed, at the guilty plea hearing of Gregory Jones, Morgan's co-conspirator, that "Jones had in fact manufactured a counterfeit driver's license and credit card with matching name to successfully obtain a line of credit at a Lowe's hardware store."  United States v. Jones, 557 F. Supp. 2d 630, 639 (E.D. Pa. 2008).

misusing the driver's license that it was authentic. Morgan did admit at the guilty-plea hearing that he knew that the driver's license in the name of "A.S." that he misused was "authentic."[15] By admitting to this evidence – that is, by admitting that he had misused a driver's license that was authentic – Morgan acknowledged that he had misused a real means of identification. Morgan's admission does not, however, equate to an admission that he knew *at the time* he misused the driver's license that it was "authentic." The government did not present evidence of how Morgan obtained the driver's license or evidence that Morgan had met A.S. or even knew who A.S. was. There is thus no direct evidence in the record that Morgan knew the driver's license was authentic when he misused it.[16]

The facts of Flores-Figueroa are similar to the facts of the instant matter. In Flores-Figueroa, as here, the defendant possessed counterfeit documents that contained identity information that belonged to real people. Flores-Figueroa, 129 S.Ct. at 1889 (the counterfeit social security and registration cards that Flores-Figueroa presented to his employer used his own name but "the numbers on both cards were in fact numbers assigned to other people"). However, as in Flores-Figueroa, this is not a "classic" case of identity theft in which the government could have presented evidence that, for example, Morgan sifted through another person's garbage to

---

[15] Morgan now argues that he never "agreed and admitted to this 'A.S.' authentic PA driver's license," and never agreed that he "knew" of the authenticity of this license (Reply 1-2), arguments that are contradicted by Morgan's express agreement to the facts summarized at his guilty-plea hearing.

[16] The government did state in the Change of Plea Memorandum and at the guilty-plea hearing that it would have presented as a witness at trial a representative of the Pennsylvania Bureau of Motor Vehicles, who would have testified that "it issued the driver's license to this individual with the initials A.S." (Id. at 35:24-36:1.) The government does not, however, reference this proffered evidence in its opposition to the instant motion, likely because the evidence does not establish one way or another whether Morgan knew, or even cared, that the driver's license was authentic *at the time* that he misused it.

obtain his or her identity information or "used another person's identification to get access to that person's bank account." Id. at 1893 ("Indeed, the examples of identity theft in the legislative history (dumpster diving, computer hacking, and the like) are all examples of the types of classic identity theft where intent should be relatively easy to prove, and there will be no practical enforcement problem.") Rather, Morgan appears to have taken existing identity information – a driver's license in the name of A.S. that could have been real or counterfeit – and used it to create counterfeit documents. Because Morgan's identity fraud scheme to create counterfeit identification documents did not necessarily require the misuse of authentic means of identification – the scheme might only have required the misuse of authentic *looking* means of identification – it cannot be inferred that Morgan knew at the time that he misused A.S.'s driver's license that it was authentic. Instead, as in Flores-Figueroa, Morgan's misuse of the driver's license occurred in circumstances where it might not have mattered to Morgan whether or not the driver's license was that of a real person. Flores-Figueroa, 129 S.Ct. at 1893 ("But perhaps the defendant did not care whether the papers (1) were real papers belonging to another person or (2) were simply counterfeit papers.").

The evidence presented by the government showed "at best" that Morgan had what *purported* to be an authentic driver's license – but there was no evidence regarding how Morgan obtained the driver's license or whether he knew that it was real at the time and not itself a forgery. See De La Rosa, 346 F. App'x at 470-72 (although defendant had stipulated that he submitted a passport application that matched the name of a real person, the court found that "at best" the defendant "had what purported to be an authentic certified copy of a birth certificate" because there was no evidence regarding how he obtained the copy "or whether he knew that it was real and not a forgery" ). In sum, the government has not established that there was a factual

basis in the record to conclude that Morgan knew or cared at the time that he misused A.S.'s driver's license that it was authentic.[17] There is no evidence that *at the time* Morgan was misusing the driver's license he knew it belonged to a real person.

## IV.     Conclusion

Although Morgan admitted at his guilty plea hearing that the driver's license he misused was authentic, there is no evidence in the record that at the time Morgan was misusing the driver's license he knew it belonged to a real person. Furthermore, no inference can be drawn from the circumstantial evidence presented by the government that Morgan knew it belonged to a real person or that Morgan's identity fraud scheme required the use of authentic means of identification to create the counterfeit identity information that was the end-product of Morgan's plant. The parties, however, have not provided sufficient briefing concerning what the effect of such a finding might be in this case. Accordingly, I will order the parties to submit supplemental briefing on this issue within 20 days.

---

[17] Morgan also argues, in his Reply, that the government acknowledged his truthfulness when it filed a motion under U.S.S.G. § 5K1.1 for a downward departure in his sentence because of his cooperation. (Reply 1.) This argument, however, is irrelevant. As noted above, the court already must accept the truth of the Morgan's factual allegations unless they are clearly frivolous on the basis of the existing record. Forte, 865 F.2d at 62.

Morgan further argues in his Reply that the government misrepresents the truth because it reduced the amount of monetary loss for which it indicted Morgan from $5 million to $1.5 million and the number of victims from 250 to 50. (Reply 2.) He also argues in his Reply that the government "failed to establish a leadership role, thus reducing my base offense level another 4 points." (Id.) Lastly, he argues in his Reply that "[t]he 1029(a)(1) producing and trafficking in counterfeit access devices, is the same argument that is being used to establish the 1028A charge. (Id.) Morgan does not, however, support any of these arguments with facts or legal authority and does not explain how they relate to his claims of ineffective assistance of counsel or a violation of due process. It is apparent that these arguments are wholly extraneous and irrelevant to Morgan's motion under § 2255.